**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| DOE 1, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 17-1033 (DLF) |
| TUKUR YUSUF BURATAI, *et al.*, | |
| *Defendants.* | |

## MEMORANDUM OPINION

The plaintiffs in this case are Nigerian nationals who allege that the defendants—officials in the Nigerian government, military, and police—brutally tortured and killed peaceful protesters. Before the Court are the defendants' Motions to Dismiss. Dkt. 35; Dkt. 36. Because the Court lacks personal jurisdiction over the defendants and lacks subject-matter jurisdiction over the action, the Court must grant the motions and dismiss this action.

## I. BACKGROUND

This suit arises from a long-running intra-Nigerian conflict between the Nigerian government and Biafrans, who are people of predominantly Igbo ethnicity and Christian religion who have sought secession from Nigeria for decades. *See* Compl. ¶¶ 44–47, Dkt. 1. Biafra declared independence in 1967, resulting in the Nigerian Civil War, but Biafra was reintegrated into Nigeria in 1970. *See* Dkt. 39-1 at 6, 11. The independence movement persisted, however, as did clamp-down efforts by the Nigerian government and its military, which is dominated by Nigerians of Hausa-Fulani ethnicity and Muslim religion. *See* Compl. ¶¶ 45–46.

On January 18, 2016, a pro-Biafran organization, the Indigenous People of Biafra, held a protest at the National High School in Aba, Abia State, Nigeria. *Id.* ¶¶ 22, 179. Nigerian

military and police forces allegedly "fired into the private observation and peaceful protest." *Id.*
¶ 179. On February 9, 2016, the Indigenous People of Biafra organized another gathering at the
National High School. *Id.* ¶¶ 57–58. When the participants gathered for morning prayers,
Nigerian military and police forces allegedly "stormed the high school campus, scaled the
fences, and began to indiscriminately shoot the assemblage." *Id.* ¶¶ 56–60. According to the
complaint, more than thirty members of the Indigenous People of Biafra were fatally or critically
wounded; many more were arrested and tortured. *Id.* ¶ 60.

On May 29, 2016, hundreds of pro-Biafran Igbo Nigerians travelled to Onitsha, Anambra
State, Nigeria. *Id.* ¶ 51. They planned to participate the next day in Biafran Patriots Day events,
planned by the Indigenous People of Biafra to commemorate Biafra's 1967 declaration of
independence. *See id.* ¶ 49. That night, Nigerian military and police forces allegedly attacked
Igbo Nigerians sleeping in St. Edmund's Catholic Church. *Id.* ¶ 51–52. Using tear gas and live
ammunition, the attackers "kill[ed] and injur[ed] many as they slept." *Id.* On May 30, the
military and police forces allegedly "returned to slaughter more ethnic Igbos." *Id.* ¶ 53.

The ten plaintiffs sued on the following Biafran Patriots Day—May 30, 2017, *id.* at 53,
and the Court permitted them to proceed anonymously to avoid retaliation, *see* Dkt. 4. The
plaintiffs are Nigerian nationals. *See* Compl. ¶ 1. Four plaintiffs (John Does 6 through 9) are
legal representatives of alleged victims of extrajudicial killings caused by the attacks in Abia
State on January 18 and February 9, 2016. *Id.* ¶¶ 142–86. Five plaintiffs (John Does 1 through
5) are legal representatives of alleged victims of extrajudicial killings caused by the attacks in
Anambra State on May 29-30, 2016, *id.* ¶¶ 79–141, and one plaintiff (John Doe 10) was
allegedly tortured himself after being detained during those attacks, *id.* ¶¶ 187–99. The plaintiffs
assert claims under the Alien Tort Statute, 28 U.S.C. § 1350, and the Torture Victims Protection

Act of 1991, which provides a civil cause of action to victims of torture and extrajudicial

killings:

> Sec. 2.  Establishment of Civil Action.
>
> (a) Liability.—An individual who, under actual or apparent authority, or color of law, of any foreign nation—
>> (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
>> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

Pub. L. No. 102–256, § 2(a), 106 Stat 73, 73 (Mar. 12, 1992) (codified as a note to 28 U.S.C.

§ 1350).[1]

---

[1] The Torture Victims Protection Act goes on to define extrajudicial killing and torture:

(a) Extrajudicial Killing.—For the purposes of this Act, the term "extrajudicial killing" means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation. . . .

(b) Torture.—For the purposes of this Act—

(1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

(A) the intentional infliction or threatened infliction of severe physical pain or suffering;

(B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(C) the threat of imminent death; or

As defendants, the complaint names sixteen members of the Nigerian government, military, and police who allegedly "conspired and agreed that killings of Biafran civilians were necessary to quash political opposition . . . and to terrorize the population." Compl. ¶ 63. Accordingly, they planned, directed, and executed the attacks against Igbo Nigerians; the Nigerian military and police forces who perpetrated the torture and extrajudicial killings "act[ed] under the command of, in conspiracy with, and/or as the agent of one or more of the Defendants." *Id.* ¶ 65. In particular, the defendants are:

- Lieutenant General Tukur Yusuf Buratai – Chief of Staff of the Nigerian Army, Compl. ¶¶ 12–13;

- Lawal Musa Daura – Director General of the Nigerian State Security Service, *id.* ¶¶ 14–15;

- Major General Ibrahim Attahiru – Commander of the 82nd Division of the Nigerian Army, *id.* ¶¶ 16–18;

- Major M.I. Ibrahim – Commander of the Nigerian Military Police in Onitsha and Abia State, Nigeria, *id.* ¶¶ 19–21;[2]

- Lieutenant Colonel Kasim Umar Sidi – Commander of the 144th Battalion of the Nigerian Army, *id.* ¶¶ 22–24;

- Colonel Issah Maigari Abdullahi – Commander of the 302 Artillery Regime of the Nigerian Army and the Onitsha Military Cantonment in Anambra State, Nigeria, *id.* ¶¶ 25–30;

- Solomon Arase – Inspector General of the Nigerian Police Force (until his retirement on June 21, 2016), *id.* ¶¶ 31–32;

---

(D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Pub. L. No. 102–256, § 3.

[2] The defendants state that this individual, correctly identified, is "Major T.O. Ibrahim." Defs.' Mem. at 8, Dkt. 36-1.

- Ibrahim Kpotun Idris – current Inspector General of the Nigerian Police Force (Arase's successor), *id.* ¶¶ 33–34;

- Okezie Victor Ikpeazu – Governor of Abia State, Nigeria, *id.* ¶ 35;

- Willie Obiano – Governor of Anambra State, Nigeria, *id.* ¶ 36;

- Habila Hosea – Commissioner of the Nigerian Police Command for Abia State, Nigeria during the alleged attacks (now the Deputy Inspector General of the Nigerian Police Force), *id.* ¶ 37;[3]

- Peter Nwagbara – Assistant Commissioner of the Nigerian Police Command for Abia State, Nigeria, *id.* ¶ 38;

- James Oshim Nwafor – Chief Superintendent of Police and Officer-in-Charge of the Special Anti-Robbery Squad of the Nigerian Police Command for Anambra State, Nigeria, *id.* ¶ 39;

- Hassan Karma – Commissioner of the Nigerian Police Command for Anambra State, Nigeria, *id.* ¶ 40;

- Bassey Abang – Chief Superintendent of Police and Officer-in-Charge of the Special Anti-Robbery Squad for Anambra State, Nigeria, *id.* ¶ 41;

- Johnson Babatunde Kokomo – Deputy Commissioner of Police in charge of operations in Anambra State, Nigeria, *id.* ¶ 42.

In approximately August 2017, the Nigerian government—acting through its embassy in the United States—transmitted a diplomatic note to the U.S. Department of State requesting a suggestion of immunity for the defendants. *See* Manu Decl. ¶¶ 3–5, Dkt. 36-2; *see also* Dkt. 41-1 at 7–10. According to the request, "the Nigerian Government categorically disputes the Plaintiffs' claims and their characterization of the facts and further denies that the Defendants committed any wrongdoing or violated Nigerian, United States, or international law," and the defendants "are current or former government officials [who] are being sued with respect to their

---

[3] The defendants state that this individual, correctly identified, is "Habila Joshak." Defs.' Mem. at 8.

authorized official actions, not their unauthorized personal actions." Manu Decl. ¶ 6. The request further states:

> The lawsuit appears to challenge actions taken by officials of the Nigerian Government to defend Nigeria's unity, preserve internal security, maintain law, order and public safety, and preserve its territorial integrity. Those acts are attributable to the Government of Nigeria and were therefore performed in an official capacity.

> By expressly challenging Defendants' exercise of their official powers as head and officers of the Nigerian Army, heads and officers of the Nigerian Police Force, head of the Department of State Security Services and Executive State Governors, respectively, Plaintiffs' claims challenge Defendants' exercise of their official powers as officials of the Government of Nigeria. Moreover, the acts for which Defendants are sued are acts that could only be carried out in exercise of the powers of their respective offices.

> The Nigerian Government attaches importance to obtaining prompt dismissal of the proceedings against its current and former officials in view of the significant foreign policy implications of such an action. This is [in] view of the fact that the action appears to be a politically-motivated effort to evoke and abuse the judicial processes of the United States to achieve political ends antagonistic to the unity and integrity of the Federal Republic of Nigeria.

*Id.* Accordingly, "the Government of Nigeria respectfully request[ed] that the United States Government promptly submit a suggestion of immunity in the *Doe v. Buratai* action." *Id.*

On September 2, 2017, Anthony O. Egbase—purportedly on behalf of all defendants—waived service, thus triggering a 90-day deadline by which the defendants were required to respond to the complaint. Dkt. 31; *see also* Fed. R. Civ. P. 4(d)(3); Dkt. 27 (Egbase notice of appearance). Two weeks before the response was due, however, Jude C. Iweanoge entered an appearance on behalf of one defendant, Willie Obiano. Dkt. 32. According to Obiano, Egbase was retained by the Attorney General of the Federal Republic of Nigeria to represent all of the defendants, but Obiano did not know about or authorize Egbase's appearance for Obiano or the waiver of service filed by Egbase on Obiano's behalf. Dkt. 37; *see also* Dkt. 37-1 (letter from Obiano on November 14, 2017 stating that his legal representative is Iweanoge); Dkt. 37-4

(email from Egbase's law firm to Iweanoge on November 27, 2014 stating that, until Iweanoge raised the issue, Egbase "had no indication that Governor Obiano or anyone else had taken exception to the Federal Attorney General's engagement of our office to represent all defendants"). Thus, on November 29, 2017, Obiano independently moved to dismiss based on (1) ineffective service; (2) lack of personal jurisdiction; (3) lack of subject-matter jurisdiction due to foreign-official immunity, the act of state doctrine, and the political question doctrine; and (4) failure to state a claim, along with a grab-bag of other grounds. Dkt. 35. The next day, Egbase filed a motion to dismiss, purportedly on behalf of all defendants and still including Obiano, on similar grounds (except for ineffective service). Dkt. 36. Obiano promptly moved to strike Egbase's appearance, waiver of service, and pleadings on Obiano's behalf. Dkt. 37. The case was reassigned to the undersigned judge on December 5, 2017.

## II. LEGAL STANDARDS

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a party may move to dismiss an action when the court lacks personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "On such a motion, the plaintiff bears the burden of 'establishing a factual basis for the exercise of personal jurisdiction' over each defendant." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 20–21 (D.D.C. 2017) (quoting *Crane v. N.Y. Zoological Soc.*, 894 F.2d 454, 456 (D.C. Cir. 1990)). To meet this burden, a plaintiff cannot rely on conclusory allegations, *id.*, but rather must allege specific facts connecting the defendant with the forum, *see Shibeshi v. United States*, 932 F. Supp. 2d 1, 2–3 (D.D.C. 2013) (internal quotation marks omitted) (citing *Second Amendment Foundation v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)). When ruling on a 12(b)(2) motion, the court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *Triple Up Ltd.*, 235 F. Supp.

3d at 20 (internal quotation marks omitted). "Ultimately, the [c]ourt must satisfy itself that it has jurisdiction to hear the suit." *Id.* at 20–21 (internal quotation marks omitted).

Under Rule 12(b)(1), a party may move to dismiss an action when the court lacks subject-matter jurisdiction, Fed. R. Civ. P. 12(b)(1), and foreign-official immunity is a question of subject-matter jurisdiction, *see Rishikof v. Mortada*, 70 F. Supp. 3d 8, 11, 16 n.4 (D.D.C. 2014); *Lewis v. Mutond*, 258 F. Supp. 3d 168, 170–71 (D.D.C. 2017), *appeal filed*, No. 17-7118 (D.C. Cir. Aug. 9, 2017); *Rosenberg v. Pasha*, 577 F. App'x 22, 23 (2d Cir. 2014); *see also Belhas v. Ya'alon*, 515 F.3d 1279, 1281 (D.C. Cir. 2008) (evaluating foreign *sovereign* immunity as a question of subject-matter jurisdiction). Because it is "presumed that a cause lies outside [the] limited jurisdiction" of the federal courts, the party invoking federal jurisdiction bears the burden of establishing it. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994).

"When ruling on a Rule 12(b)(1) motion, the court must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (internal quotation marks and citation omitted). Those factual allegations, however, receive "closer scrutiny" than they would in the Rule 12(b)(6) context, *id.*, and particularly because immunity "provides protection from suit and not merely a defense to liability, . . . the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case," *Jungquist v. Al Nahyan*, 115 F.3d 1020, 1027–28 (D.C. Cir. 1997) (internal quotation marks and alteration omitted). Also, unlike when evaluating a Rule 12(b)(6) motion, a court may consider materials outside the pleadings to evaluate whether it has jurisdiction, *see Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005), such as the complaint supplemented by undisputed facts in the record, *see Herbert v. Nat'l Acad. of Scis.*, 974 F.2d

192, 197 (D.C. Cir. 1992); *see also Lewis*, 258 F. Supp. 3d at 171; *Belhas*, 515 F.3d at 1281.

Without subject-matter jurisdiction, the court must dismiss the action. U.S. Const. art. III, § 2;

Fed. R. Civ. P. 12(b)(1), 12(h)(3).

## III. ANALYSIS

### A. Personal Jurisdiction

The defendants ask the Court to dismiss this action for lack of personal jurisdiction. *See*

Defs.' Mot. at 1, Dkt. 36; Obiano Mot. at 1, Dkt. 35. In the usual case, "[t]o establish personal

jurisdiction over a non-resident, a court must first examine whether jurisdiction is applicable

under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies

the constitutional requirements of due process." *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187,

1189 (D.C. Cir. 2013) (internal quotation marks and alteration omitted). Alternatively, Rule

4(k)(2) provides that, if the claim arises under federal law, if a summons has been served or

service has been waived, and if the defendant is beyond the jurisdiction of any one state's courts,

then federal courts may exercise jurisdiction—without regard to the forum's long-arm statute—

so long as due process requirements are met. *See* Fed. R. Civ. P. 4(k)(2); *Mwani v. bin Laden*,

417 F.3d 1, 10 (D.C. Cir. 2005). For this inquiry, a court may assume that the defendant is

outside the long-arm jurisdiction of any one state's courts unless the defendant "concede[s] to the

jurisdiction of any state." *Mwani*, 417 F.3d at 11. And, although the "forum" for purposes of

Rule 4(k)(2) is not a single state but "the United States as a whole," *id.*, the constitutional inquiry

is "otherwise the same," *Safra v. Palestinian Auth.*, 82 F. Supp. 3d 37, 47 (D.D.C. 2015); *see*

*also Triple Up Ltd.*, 235 F. Supp. 3d at 22.

Here, the plaintiffs do not contend that the District of Columbia's long-arm statute

applies. Nor could they—the long-arm statute generally extends only to defendants who transact

business in the District. *See* D.C. Code Ann. § 13-423. The Court thus analyzes whether personal jurisdiction is permissible under Rule 4(k)(2). The key predicates are met: the plaintiffs assert federal claims; service has been waived for at least fifteen of the sixteen defendants, and the sixteenth defendant's assertion that he did not waive service does not alter the analysis;[4] and the defendants are outside the long-arm jurisdiction of any one state because the defendants do not concede to any one state's jurisdiction. *See* Fed. R. Civ. P. 4(k)(2); *Mwani*, 417 F.3d at 11. Therefore, personal jurisdiction hinges on whether its exercise is consistent with the Constitution. Fed. R. Civ. P. 4(k)(2)(B).

"Whether the exercise of jurisdiction is 'consistent with the Constitution' for purposes of Rule 4(k)(2) depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment." *Mwani*, 417 F.3d at 11. In general, two types of contacts can give rise to personal jurisdiction. First, "continuous and systematic" contacts with the United States can give rise to *general* personal jurisdiction, which allows the court to exercise "personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 & n.9 (1984). General personal jurisdiction is not relevant here because the plaintiffs do not attempt to allege

---

[4] At least fifteen of the sixteen defendants waived service. Dkt. 31. The waiver was also filed on behalf of the sixteenth defendant, Willie Obiano, but Obiano disputes that he authorized the waiver and he moves to strike the allegedly unauthorized appearance on his behalf. *See* Dkt. 37; *see also supra* pp. 2–7 (describing procedural history). Obiano further argues that he has not been served effectively. *See* Obiano Mot. at 1, 22–30, Dkt. 35. The Court need not address these issues because, regardless whether the waiver and service were effective with regard to Obiano, personal jurisdiction would not comport with due process. *See Nikbin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 69 n.14, 71 (D.D.C. 2007) (declining to determine whether foreign service was effective because the Court ultimately found that personal jurisdiction would be unconstitutional regardless).

that the defendants had continuous and systematic contacts with the United States. *See, e.g.*, Compl. ¶ 1; *see also Nikbin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 71–72 (D.D.C. 2007).

Second, a court may exercise *specific* personal jurisdiction over a non-resident defendant who "has sufficient contacts with the United States as a whole," *Mwani*, 417 F.3d at 11, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice," *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). Due process "requir[es] that individuals have fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotation marks omitted). "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum," and "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Id.* (footnote, citations, and internal quotation marks omitted).

In some circumstances, tortious acts committed overseas can constitute sufficient U.S. contacts to pass constitutional muster. *Nikbin*, 471 F. Supp. 2d at 72. In *Mwani v. bin Laden*, for example, the D.C. Circuit found that Osama bin Laden had sufficient contacts with the United States because the foreign plaintiffs alleged that bin Laden "orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the [United States]," and that bin Laden was engaged in "an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders." 417 F.3d at 13. Thus, bin Laden purposefully directed his terrorist activities at the United States and the plaintiffs' injuries arose out of those activities, subjecting

bin Laden to specific personal jurisdiction. *Id*; *see also Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 89 (D.D.C. 2006) (exercising specific personal jurisdiction over Hamas where the plaintiffs alleged that Hamas committed a bombing in Tel Aviv "calculated to cause injury to U.S. citizens," and where the bombing "by no means represent[ed] an isolated contact between Hamas and the United States).

But torture committed abroad—even against Americans—does not support the exercise of specific personal jurisdiction without some further connection to the United States. *Nikbin*, 471 F. Supp. 2d at 72. For example, in *Price v. Socialist People's Libyan Arab Jamahiriya*, the D.C. Circuit stated that "tortur[ing] two American citizens in Libya" would be "insufficient to satisfy the usual 'minimum contacts' requirement" for personal jurisdiction. 294 F.3d 82, 95 (D.C. Cir. 2002). "The *Price* and *Mwani* opinions, read together, suggest that acts of terror or torture committed against American citizens abroad, *standing alone*, can support personal jurisdiction only if the defendant expressly intended the effects of the act to be felt in the United States." *Nikbin*, 471 F. Supp. 2d at 73; *see also Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 73 n.26 (D.D.C. 2013) (endorsing *Nibkin* in an Alien Tort Statute and Torture Victim Protection Act case brought by a foreign torture victim, and expressing doubt that the court could exercise personal jurisdiction over the defendants, Iranian President Mahmoud Ahmadinejad and Ayatollah Khamenei, because the foreign plaintiffs did "not present[] evidence that any of the defendants' actions that took place in Iran were 'expressly intended' to have effects felt in the United States").

In this case, the plaintiffs have not established that the defendants had "sufficient contacts with the United States" or that they "purposefully directed" their activities at the United States. Regarding personal jurisdiction, the plaintiffs merely allege:

> This Court has personal jurisdiction over Defendants and venue is proper under 28 U.S.C. 1391(b)(3) because Defendants perpetrated crimes against humanity that establish universal jurisdiction over Plaintiffs' claims of extrajudicial killings or torture under color of Nigerian law involving exclusively Nigerian Plaintiffs and Nigerian Defendants.

Compl. ¶ 1.  Far from "sufficient" contacts, the complaint does not allege that the Nigerian defendants had *any* contacts with the United States, much less that the Nigerian defendants directed their activities at the United States in any way or that the plaintiffs' claims arise from the defendants' U.S. contacts.  Rather, the complaint alleges that Nigerian officials planned and carried out torture and killings in Nigeria, against Nigerian citizens, and intending to affect Nigerian society and politics, and without intending any effects in the United States whatsoever.  *See, e.g.*, Compl. ¶¶ 63–65.  If torture committed abroad against *American* citizens is insufficient to establish personal jurisdiction without some further connection to the United States, then torture committed abroad against *foreign* citizens can hardly establish personal jurisdiction without some further connection, which is wholly lacking in this case.  *See* Price, 294 F.3d at 95; *Nikbin*, 471 F. Supp. 2d at 73; *Mohammadi*, 947 F. Supp. 2d at 73 n.26.  Therefore, the complaint's allegations do not support personal jurisdiction over the defendants.  *See Nikbin*, 471 F. Supp. 2d at 73 (concluding that specific personal jurisdiction was impermissible because the complaint alleged that former Iranian President Rafsanjani "planned, ordered, authorized, or consciously disregarded the occurrence of acts against [the plaintiff] that took place entirely in Iran and might constitute torture," but did not allege "that the effects of these acts were directed at the United States").

For their part, the plaintiffs maintain that "proper service of a summons and complaint is sufficient to vest the Court with personal jurisdiction over the defendant as to claims of the violation of certain universally accepted norms of international human rights law."  Pls.' Opp'n

at 35, Dkt. 39.  But waiving service does not waive objections to personal jurisdiction.  *See* Fed. R. Civ. P. 4(d)(5).  And Rule 4(k)(2) explicitly provides that service establishes personal jurisdiction only when other conditions are met, including the condition that jurisdiction must be consistent with the Constitution.  *See* Fed. R. Civ. P. 4(k)(2)(B).  Furthermore, the out-of-circuit cases cited by the plaintiffs are irrelevant or stand for contrary positions.  *See Doe v. Constant*, 354 F. App'x 543, 546 (2d Cir. 2009) (not addressing the constitutional question of specific personal jurisdiction); *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 99 (2d Cir. 2000) (exercising personal jurisdiction only after analyzing the constitutional question, and without relying on a concept of universal jurisdiction); *Kadic v. Karadzic*, 70 F.3d 232, 246–48 (2d Cir. 1995) (analyzing service of a defendant who was physically present in the United States under Rule 4(e)(2), not Rule 4(k)(2)); *Filartiga v. Pena-Irala*, 630 F.2d 876, 884–86 (2d Cir. 1980) (not addressing the constitutional question of specific personal jurisdiction); *Sikhs for Justice v. Nath*, 850 F. Supp. 2d 435, 442–45 (S.D.N.Y. 2012) (analyzing personal jurisdiction under Rule 4(k)(1), not Rule 4(k)(2), and declining to address the constitutional question because the state long-arm statute did not extend to the defendant, yet still emphasizing that personal jurisdiction must comport with due process).  Finally, the plaintiffs suggest that the Torture Victims Protection Act confers "universal jurisdiction for crimes against all mankind," and that "Congress assumed that crimes against mankind would be treated like the sister crime of piracy which can be prosecuted in every jurisdiction in the world."  Pls.' Opp'n at 36.  Even when targeting heinous conduct, however, Congress cannot legislate away the due process requirements of the Constitution.  *See* U.S. Const. art. VI, cl. 2.  And although the plaintiffs claim that other circuits have retired the usual due process inquiry in torture and terror cases, *see*

Pls.' Opp'n at 39–40, the D.C. Circuit has not, *see Mwani*, 417 F.3d at 11–13; *Price*, 294 F.3d at 95; *Nikbin*, 471 F. Supp. 2d at 73.

Accordingly, the plaintiffs have not carried their burden of showing that the Court may exercise personal jurisdiction over the defendants consistent with the Constitution. U.S. Const. amend. V; *see also* Fed. R. Civ. P. 4(k)(2)(B); *Triple Up Ltd.*, 235 F. Supp. 3d at 20–21. The Court will therefore dismiss this action for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2).

### B. Foreign-Official Immunity

The defendants also ask the Court to dismiss this action for lack of subject-matter jurisdiction, based on foreign-official immunity. *See* Defs.' Mot. at 1; Obiano Mot. at 1. Foreign-official immunity is a common-law doctrine. *See Samantar v. Yousuf*, 560 U.S. 305, 324–25 (2010); *Lewis*, 258 F. Supp. 3d at 171–72; *Rishikof*, 70 F. Supp. 3d at 11–12. Under the common law, a foreign official may be entitled to status-based or conduct-based immunity. *Lewis*, 258 F. Supp. 3d at 171–72. Status-based immunity "is available to diplomats and heads of state and shields them from legal proceedings 'by virtue of his or her current official position, regardless of the substance of the claim.'" *Id.* (quoting Chimene I. Keitner, *The Common Law of Foreign Official Immunity*, 14 Green Bag 2d 61, 63 (2010)). Conduct-based immunity, at issue in this case, "is available to 'any public minister, official, or agent of the foreign state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state.'" *Id.* at 172 (alterations omitted) (quoting Restatement (Second) of the Foreign Relations Law of the United States § 66(f) (1965));[5] *see also Sikhs for*

---

[5] In 1987, the American Law Institute published the Third Restatement of Foreign Relations Law. The Third Restatement did not discuss the common law of foreign-official immunity. Instead, it included a section on the 1976 Foreign Sovereign Immunities Act, under which courts at the time analyzed foreign-official immunity. *See* Restatement (Third) of the Foreign Relations Law of the United States ch. 5.A (1987). In *Samantar*, the Supreme Court explained that

*Justice v. Singh*, 64 F. Supp. 3d 190, 193 (D.D.C. 2014) ("Conduct-based immunities shield individuals from legal consequences for acts performed on behalf of the state during their tenure in office." (alteration and internal quotation marks omitted)).

According to the common law, courts determine foreign-official immunity with a "two-step procedure." *Samantar*, 560 U.S. at 311–12. First, the foreign-official defendant can "request a 'suggestion of immunity' from the State Department." *Samantar*, 560 U.S. at 311. If the request is granted, "the district court surrender[s] its jurisdiction." *Id.* But "in the absence of recognition of the immunity by the Department of State," the district court moves to the second step, in which "a district court ha[s] authority to decide for itself whether all the requisites for such immunity existed." *Id.* (internal quotation marks omitted). "In making that decision, a district court inquire[s] whether the ground of immunity is one which it is the established policy of the State Department to recognize." *Id.* at 312 (alterations and internal quotation marks omitted); *see also, e.g.*, *Manoharan v. Rajapaksa*, 845 F. Supp. 2d 260, 262–63 (D.D.C. 2012), *aff'd*, 711 F.3d 178 (D.C. Cir. 2013) (applying the two-step procedure); *Lewis*, 258 F. Supp. 3d at 171–72 (same).

### 1. The Defendants' Immunity

Turning to the first step, the defendants requested a suggestion of immunity from the State Department in approximately August 2017. *See* Manu Decl. ¶¶ 3–5, Dkt. 36-2; *see also* Dkt. 41-1 at 7–10. As of June 2018, the State Department had not made a decision on the request. *See* Defs.' Status Report of June 13, 2018, Dkt. 44 (relaying the State Department's

---

individual foreign officials cannot claim immunity under the Foreign Sovereign Immunities Act but they may be able to assert immunity under the common law, and the Supreme Court described the Second Restatement as an "instructive" source on common-law immunity. 560 U.S. at 308, 321. Thus this Court refers to the Second Restatement instead of the Third.

statement made on the same date that: "The Department of State has not made a decision on Nigeria's request for a suggestion of immunity for the defendants in this case, although the Department is actively deciding what if any action to take on Nigeria's request. As we discussed last October, and as stated in my email to you of October 11, 2017, it is ultimately a decision for the Department of Justice whether to file a suggestion of immunity or no immunity."). And as of today, the State Department has not filed a suggestion of immunity, a suggestion of non-immunity, or any other document with the Court, so nearly one year has elapsed since the defendants submitted their request for the State Department. Even "in the absence of recognition of the immunity by the Department of State," however, "a district court ha[s] authority to decide for itself whether all the requisites for such immunity existed," which the Court will now address. *Samantar*, 560 U.S. at 311.

Here, the requisites for conduct-based foreign-official immunity are met because (1) the defendants are "public minister[s], official[s], or agent[s]" of Nigeria; (2) they acted in their "official capacit[ies];" and (3) exercising jurisdiction would "enforce a rule of law against the state." *See Lewis*, 258 F. Supp. 3d at 172 (quoting Restatement (Second) of Foreign Relations Law § 66(f)). First, all of the defendants were Nigerian public ministers, officials, or agents when they allegedly violated the Torture Victims Protection Act: as alleged in the complaint, they were Nigerian governors, the Director General of the Nigerian State Security Service, members of the Nigerian army ranging from the Chief of Staff to unit commanders, and members of the Nigerian police ranging from the Inspector General to state commissioners and superintendents. Compl. ¶¶ 12–42; *supra* pp. 4–5 (listing the defendants and their positions). And all but one of the defendants remained in those positions when this suit began. *See id.*

The plaintiffs counter that low-level officers do not qualify for foreign-official immunity. Even the defendants with the least authority, however, are hardly low-level—they command and supervise large Nigerian military units and police forces for entire Nigerian states. *See id.*; *see also* Compl. ¶ 73 (acknowledging that the defendants hold "powerful positions of military, police and militia authority"). Moreover, this issue overlaps with the second requisite for conduct-based immunity: whether the defendants *acted* in their official capacities. Significant, high-level "decision-making authority is not . . . required" for immunity and "past case law has not focused on the degree of an official's 'authority' to act on behalf of the foreign state" because "conduct-based immunity may extend to an 'agent' of a foreign state." *Rishikof*, 70 F. Supp. 3d at 13 (citing *Samantar*, 560 U.S. at 321). And "[t]he rank of the agent who performed the act was not the determining factor." *Id.* (citing examples). Rather, "it has been the act itself and whether the act was performed on behalf of the foreign state and thus attributable to the state that has been the focus of the courts' holdings." *Id.* The Court thus addresses this issue under the second requisite for conduct-based immunity.

Under that inquiry, the defendants acted in their official capacities, *i.e.*, "as part of [their] official dut[ies]." *Lewis*, 258 F. Supp. 3d at 173. Although the plaintiffs take great pains to emphasize that they are suing the defendants in the defendants' personal or "individual capacities alone," Compl. ¶¶ 73–74; *see also id.* at 3, ¶¶ 43, 203; Pls.' Opp'n at 18–25, the allegations show otherwise. "[S]uits against officers in their personal capacities must pertain to private action[s],—that is, to actions that exceed the scope of authority vested in that official so that the official cannot be said to have acted on behalf of the state." *Lewis*, 258 F. Supp. 3d at 171 (quoting *Doe I v. Israel*, 400 F. Supp. 2d 86, 104 (D.D.C. 2005)). By contrast, the defendants' alleged actions were part of their official duties within the Nigerian government, military, and

police. According to the complaint, the defendants "directed the Armed Forces, the Police Command, [State Security Service], and militia force paramilitary troops to use lethal force." Compl. ¶ 63. The defendants all "exercised effective command and operational control" over the Nigerian military and police forces and the State Security Service, *id.* ¶¶ 12, 14, 24, 30, 32, 33, 35–42, or "exercised command authority and control over the perpetrators" of the attacks, *id.* ¶¶ 16, 22, 28. These allegations do not describe private actions. Rather, as alleged by the complaint, the defendants acted within the structure of the Nigerian government and military, drawing on official powers and duties and relying on the governmental and military chains-of-command—*i.e.*, within their official capacities. *See Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) (explaining that "the common law of foreign sovereign immunity recognized an individual official's entitlement to immunity for 'acts performed in his official capacity,'" and stating that a "plaintiff's concession that defendant was 'at all relevant times an employee and agent of the defendant Spanish Government' sufficed to dispose of the claim against the individual defendant" (quoting Restatement (Second) of Foreign Relations Law § 66(f) and *Heaney v. Spain*, 445 F.2d 501, 504 (2d Cir. 1971))).

Furthermore, to determine whether the defendants acted in their official capacities, "it is also appropriate to look to statements of the foreign state that either authorize or ratify the acts at issue." *Lewis*, 258 F. Supp. 3d at 173 (quoting *Belhas*, 515 F.3d at 1283). In its request for a suggestion of immunity, the Federal Republic of Nigeria clearly and emphatically stated that this suit challenges the defendants' "authorized official actions," which the defendants "performed in an official capacity" and which "are attributable to the Government of Nigeria." Manu Decl. ¶ 6. The request continued:

> By expressly challenging Defendants' exercise of their official powers as head and officers of the Nigerian Army, heads and officers of the Nigerian Police Force, head

of the Department of State Security Services and Executive State Governors, respectively, Plaintiffs' claims challenge Defendants' exercise of their official powers as officials of the Government of Nigeria. Moreover, the acts for which Defendants are sued are acts that could only be carried out in exercise of the powers of their respective offices.

*Id.* These statements could not be more clear: the Nigerian government authorized and ratified the defendants' alleged actions. And although the crimes alleged are horrendous, it is not the Court's role to probe the sincerity, truth, or ethics of Nigeria's decision to embrace its officials' actions as its own. *See Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948); *cf. Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 821 (D.C. Cir. 1984) (Bork, J., concurring) ("The prospect of a federal court ordering discovery on [whether an entity acted as an agent of a foreign country such that the country "should be held responsible" for the agent's actions], to say nothing of actually deciding it, is, or ought to be, little short of terrifying."). Therefore, Nigeria's authorization and ratification establishes that the defendants acted in their official capacities. *See Lewis*, 258 F. Supp. 3d at 174 ("find[ing] the [Democratic Republic of the Congo's] Ambassador's ratification of the defendants' actions sufficient to establish that they were acting in their official capacities" and thus "find[ing] that plaintiff's complaint does not present sufficient evidence against the defendants to sue them in their personal capacities"); *Doğan v. Barak*, No. 15-cv-8130, 2016 WL 6024416, at *9 (C.D. Cal. Oct. 13, 2016), *appeal filed*, No. 16-56704 (9th Cir. Nov. 14, 2016) (concluding that conduct-based foreign-official immunity is available "where the sovereign state officially acknowledges and embraces the official's acts").

Third and finally, exercising jurisdiction would have the effect of enforcing a rule of law against Nigeria. The Nigerian government claimed the defendants' actions as the country's own. *See* Manu Decl. ¶ ("authorized official actions" "attributable to the Government of Nigeria").

Therefore, a decision by this Court on the legality of the defendants' actions would amount to a decision on the legality of Nigeria's actions. *See Lewis*, 258 F. Supp. 3d at 174 (determining that a court decision would enforce a rule of law against a foreign nation because "the Court would be forced to question the [legality] of an action that a foreign nation has ratified"). Also, the plaintiffs seek millions of dollars in compensatory and punitive damages from defendants throughout Nigeria's government, military, and police. *See* Compl. at 52. A decision by this Court exacting such damages would affect how Nigeria's government, military, and police function, regardless whether the damages come from the defendants' own wallets or Nigeria's coffers. By interfering with Nigeria's government, a decision would effectively enforce a rule of law against Nigeria. *See Doğan*, 2016 WL 6024416, at *9 (granting foreign-official immunity in part because "[i]f this Court passed judgment on the legality of the [official acts alleged to violate the Torture Victims Protection Act], it would likely affect our diplomatic relationship with Turkey, Israel, and the myriad other nations with strong feelings about who was right and who was wrong").

In sum, the defendants are public ministers, officials, or agents of Nigeria who acted in their official capacities, and exercising jurisdiction in this case would effectively enforce a rule of law against Nigeria. Therefore, the defendants can properly claim foreign-official immunity. *See Lewis*, 258 F. Supp. 3d at 173.

2.      Exceptions to Immunity

The plaintiffs offer two significant counterarguments: that the defendants cannot claim foreign-official immunity because foreign-official immunity does not shield a defendant from liability for violating *jus cogens* norms, and that the Torture Victims Protection Act abrogates foreign-official immunity. *See* Pls.' Opp'n at 18–25. Both fail.

First, the plaintiffs argue that foreign-official immunity does not shield a defendant from liability for acts contrary to international *jus cogens* norms. *See* Pls' Opp'n at 19–24. A *jus cogens* norm is "a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character." *Belhas*, 515 F.3d at 1286 (quoting Vienna Convention on the Law of Treaties art. 53, May 23, 1969, 1155 U.N.T.S. 332). The crux of the plaintiffs' argument is that immunity fails in this case because alleged violations of *jus cogens* norms are by-definition outside the scope of any official authority that could provide protection from suit. *See* Pls' Opp'n at 19.

The circuits take different approaches to whether foreign-official immunity includes an exception for *jus cogens* violations. *Compare Matar*, 563 F.3d at 15 ("A claim premised on the violation of *jus cogens* does not withstand foreign sovereign immunity."), *with Yousuf v. Samantar*, 699 F.3d 763, 777 (4th Cir. 2012) ("[U]nder international and domestic law, officials from other countries are not entitled to foreign official immunity for *jus cogens* violations, even if the acts were performed in the defendant's official capacity."). Although the D.C. Circuit has not directly addressed the issue, the circuit's caselaw indicates that *jus cogens* allegations do not defeat foreign-official immunity under the common law. Before *Samantar*, the D.C. Circuit analyzed foreign-official immunity under the Foreign Sovereign Immunities Act (FSIA). In that context, the D.C. Circuit determined that "the FSIA contains no unenumerated exception [to foreign-official immunity] for violations of *jus cogens* norms." *Belhas*, 515 F.3d at 1287. Post-*Samantar*, courts analyze foreign-official immunity under the common law, not the FSIA. *Samantar*, 560 U.S. at 324–25. But "rules that appellate courts developed for foreign official immunity under the FSIA 'may be correct as a matter of common-law principles.'" *Giraldo v.*

*Drummond Co.*, 808 F. Supp. 2d 247, 250 (D.D.C. 2011), *aff'd*, 493 F. App'x 106 (D.C. Cir. 2012), *cert. denied*, 568 U.S. 1250 (2013) (quoting *Samantar*, 560 U.S. at 322 n.17). And "the D.C. Circuit's reasoning in *Belhas* [remains] instructive" in the context of foreign-official immunity under the common law:

> The court explained that, without "something more nearly express" from Congress, it would not adopt a rule that would require federal courts to "assume jurisdiction over the countless human rights cases that might well be brought by the victims of all the ruthless military juntas, presidents-for-life, and murderous dictators of the world, from Idi Amin to Mao Zedong." As the court observed, "[s]uch an expansive reading . . . would likely place an enormous strain not only upon our courts but, more to the immediate point, upon our country's diplomatic relations with any number of foreign nations."

*Id.* (quoting *Belhas*, 515 F.3d at 1287). That is, *Belhas* "reject[ed]" an expansive rule that, if a defendant "acted within his official capacity but illegally," "such unlawful acts were outside the scope of his official duties by definition." *Id.* at 251; *see also Klayman v. Obama*, 125 F. Supp. 3d 67, 80 (D.D.C. 2015) (relying on *Belhas*, albeit in the context of the Anti-Terrorism Act, for the proposition that "the wrongfulness of the alleged act does not take it beyond the scope of authority for immunity purposes").

Moreover, a *jus cogens* exception would "eviscerate any protection that foreign official immunity affords" because an exception "'merges the merits of the underlying claim with the issue of immunity.'" *Giraldo*, 808 F. Supp. 2d at 250 (quoting *Belhas*, 515 F.3d at 1292–93 (Williams, J., concurring)). That is:

> As soon as a party alleged a violation of a *jus cogens* norm, a court would have to determine whether such a norm was indeed violated in order to determine immunity—*i.e.*, the merits would be reached. When the foreign official is the defendant, there will effectively be no immunity—a civil action by definition challenges the legality of the official's acts. But as the D.C. Circuit has explained, "sovereign immunity is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits."

*Id.* (quoting *Foremost-McKesson, Inc. v. Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990)). "This would be particularly problematic in lawsuits arising from military operations, as any death resulting from such operations could give rise to a plausible allegation that *jus cogens* norms were violated;" such allegations would be enough to defeat immunity for the military officials and personnel involved. *Doğan*, 2016 WL 6024416, at *10; *cf. Filarsky v. Delia*, 566 U.S. 377, 391–92 (2012) (rejecting exceptions to qualified immunity in the § 1983 context in part because exceptions would "create[] significant line-drawing problems" that "deprive state actors of the ability to reasonably anticipate when their conduct may give rise to liability," and "[a]n uncertain immunity is little better than no immunity at all"). And "merging the question of immunity with the merits also undermines the original purpose of foreign official immunity: to avoid affronting the sovereignty of a foreign nation by passing judgment on their official government acts, which would inevitably happen if courts had to reach the merits to resolve immunity." *Doğan*, 2016 WL 6024416, at *10.

It is also significant that the executive branch has not recognized a blanket *jus cogens* exception. *See Matar*, 563 F.3d at 14; John B. Bellinger, III, *The Dog that Caught the Car: Observations on the Past, Present, and Future Approaches of the Office of the Legal Adviser to Official Acts Immunities*, 44 Vand. J. Transnat'l L. 819, 833 (2011) ("Plaintiffs undoubtedly will press for an exception to official immunity for acts that violate *jus cogens* norms, arguing that such acts can never be 'official' in nature. The State Department has never agreed with that position."); *id.* at 833–34; *see also Republic of Austria v. Altmann*, 541 U.S. 677, 689 (2004) ("In accordance with Chief Justice Marshall's observation that foreign sovereign immunity is a matter of grace and comity rather than a constitutional requirement, this Court has consistently deferred to the decisions of the political branches—in particular, those of the Executive Branch—on

whether to take jurisdiction over particular actions against foreign sovereigns and their instrumentalities." (internal quotation marks and alteration omitted)).  Among its reasons for not recognizing an exception, the executive branch has cited political, strategic, and legal considerations.  *See* Bellinger, *supra* at 833–35.  To give one specific example, the executive branch has expressed concerns that a *jus cogens* exception would threaten the immunity of U.S. officials.  As recent Legal Advisers to the State Department have recognized, reciprocity concerns play a significant role in the executive branch's immunity decisions, including the decision to not recognize a *jus cogens* exception.[6]  This Court, when assessing foreign-official immunity under the common law, must determine "whether the ground of immunity is one which it is the established policy of the State Department to recognize."  *Samantar*, 560 U.S. at 312.  The executive branch's position on a *jus cogens* exception therefore weighs heavily against the Court adopting an exception on its own, much less crafting the contours of an exception

---

[6] *See* Bellinger, *supra* at 833–34 ("An exception for *jus cogens* violations would be contrary to current international law, contrary to the longstanding positions of the career lawyers at both the State Department and Justice Department (who rightly worry about reciprocal protection for U.S. officials in foreign courts), and would require the United States to reverse [its prior positions]. . . . The reciprocity point is very important, and not a trivial concern for former U.S. officials. The United States continues to engage in controversial military and intelligence operations around the world, and former Secretary of Defense Robert Gates and former Director of the Central Intelligence Agency Leon Panetta have already been threatened with suits in foreign countries for drone attacks. Once the United States agrees to lift immunity for foreign government officials, it begins to craft state practice that could expose U.S. officials to suits abroad.  Plaintiffs would certainly allege that certain actions by U.S. officials violate *jus cogens* norms, and would argue that, as a result, such U.S. officials are not entitled to immunity."); *see also* Harold Hongju Koh, *Foreign Official Immunity After* Samantar: *A United States Government Perspective*, 44 Vand. J. Transnat'l L. 1141, 1151 (2011) ("[T]he State Department is best situated to evaluate the foreign policy and reciprocal consequences of subjecting a foreign official to suit in U.S. courts.  In some settings, personal damage actions against foreign officials may unduly chill their performance of duties, trigger reciprocity concerns about the treatment of U.S. officials sued in foreign courts, and potentially interfere with the Executive Branch's conduct of foreign affairs.").

without an established executive branch policy from which to draw.  *See Doğan*, 2016 WL 6024416, at *10.

Therefore, the Court—following courts in this circuit and other circuits—declines to adopt and apply a *jus cogens* exception.  *See Lewis*, 258 F. Supp. 3d at 171–72; *Rishikof*, 70 F. Supp. 3d at 11–12; *Giraldo*, 808 F. Supp. 2d at 250–51; *Matar*, 563 F.3d at 15; *Doğan*, 2016 WL 6024416, at *10–11; *In re Terrorist Attacks on Sept. 11, 2001*, 122 F. Supp. 3d 181, 189 (S.D.N.Y. 2015); *Rosenberg v. Lashkar-e-Taiba*, 980 F. Supp. 2d 336, 344 (E.D.N.Y. 2013). Without a doubt, the plaintiffs allege appalling conduct.  But under the common law of foreign-official immunity, such *jus cogens* allegations do not defeat the defendants' foreign-official immunity.

Turning to the second counterargument, the plaintiffs suggest that the Torture Victims Protection Act abrogates common law foreign-official immunity.  *See* Pls.' Opp'n at 24 (asserting that the Act "convey[s] a plain congressional intent that federal courts assume jurisdiction over the epidemic of torture or extrajudicial killing").  "Statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident."  *Metlife, Inc. v. FSOC*, 865 F.3d 661, 674 (D.C. Cir. 2017) (alteration omitted) (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)).  "In such cases, Congress does not write upon a clean slate."  *Texas*, 507 U.S. at 534.  "In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law," *id.*, and "silence does not suffice," *Matar*, 563 F.3d at 14; *see also Filarsky*, 566 U.S. at 389 (stating, in the context of § 1983, that "we proceed on the assumption that common-law principles of immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so." (internal

quotation marks and alterations omitted)).  Thus the Court must determine whether the Torture

Victims Protection Act "speaks directly" to the question of common law foreign-official

immunity.

The critical provision of the Torture Victims Protection Act is titled "Establishment of

Civil Action."  Pub. L. No. 102–256, § 2.  It states:

> (a) Liability.—An individual who, under actual or apparent authority, or color of
> law, of any foreign nation—
>> (1) subjects an individual to torture shall, in a civil action, be liable for
>> damages to that individual; or
>> (2) subjects an individual to extrajudicial killing shall, in a civil action, be
>> liable for damages to the individual's legal representative, or to any person
>> who may be a claimant in an action for wrongful death.

*Id.* § 2(a).  On its face, this provision addresses liability only.  It says nothing about jurisdiction

generally, nor about the specific jurisdictional issue of foreign-official immunity.  What is more,

the strongest argument for abrogation is that the provision makes liable individuals who act with

"actual authority" or "under color" of foreign law, which could conceivably include even foreign

officials acting within their official capacities who could otherwise claim immunity.  But § 1983

uses similar language susceptible to the same reading,[7] yet § 1983 leaves in place a host of

common law immunities.  *See, e.g.*, *Filarsky*, 566 U.S. at 383–84; *Malley v. Briggs*, 475 U.S.

335, 339 (1986); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976).  And courts read the Torture

Victims Protection Act in light of § 1983, which is "the most analogous statute" and which was

enacted and interpreted well before the Act.  *Manoharan v. Rajapaksa*, 711 F.3d 178, 180 (D.C.

---

[7] *See* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be
subjected, any citizen of the United States or other person within the jurisdiction thereof to the
deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be
liable . . . .").

Cir. 2013); *see also Doğan*, 2016 WL 6024416, at *11–12. Therefore, the Act does not "speak directly" or make "evident" that it abrogates common law foreign-official immunity.

In addition, the plaintiffs' argument proves too much. "If immunity did not extend to officials whose governments acknowledge that their acts were officially authorized, it would open a Pandora's box of liability for foreign military officials." *Doğan*, 2016 WL 6024416, at *12. "[A]ny military operation that results in injury or death could be characterized at the pleading stage as torture or an extra-judicial killing," thus subjecting foreign military officials who acted with "actual authority" to suit under the Torture Victims Protection Act and "embroil[ing] the Judiciary in sensitive foreign policy matters." *Id.* The Act evinces no decision to transform federal courts into a forum for adjudicating such disputes. To avoid this "slippery slope," it makes sense that the Act leaves in place conduct-based immunity, which only immunizes foreign officials' acts when they are recognized by a foreign sovereign. *Id.*

Finally, this reading does not nullify the Torture Victims Protection Act, as the plaintiffs contend. *See, e.g.*, Pls.' Opp'n at 24 ("[T]he TVPA would shrivel into nothingness and the protracted congressional labors that brought it into being would have been in vain if notwithstanding the statute, foreign individuals guilty of torture or extrajudicial killing under color of foreign law (*e.g.*, foreign officials) enjoy official common law immunity from a TVPA suit."); *id.* at 25 ("Congress [did not intend] to make the TVPA an edentulous human rights ornament by shielding all realistically imaginable TVPA defendants from suit through common law immunity."). Rather, the Torture Victims Protection Act still imposes liability on officials who torture or kill under "actual" authority, "apparent" authority, or "color of law" of a foreign nation *and* are unable to invoke foreign-official immunity, *i.e.*, "officials whose acts, while technically performed in an official capacity, are clearly not acknowledged or condoned by the

foreign sovereign." *Doğan*, 2016 WL 6024416, at *12. "Indeed, it seems Congress saw liability for former officials arising only in that situation, for it acknowledged that immunity would bar suit where the foreign sovereign recognized the acts in question." *Id.* In other words, the Act imposes liability on true outlaws, *i.e.*, individuals who commit acts for which no foreign sovereign is willing to accept responsibility—but not individuals whose conduct is authorized.

Of course, this might permit foreign nations to underhandedly immunize horrendous conduct by their officials. That concern, however, is mitigated by the fact that the executive branch can file a suggestion of non-immunity based on its assessment of the alleged misconduct, an inquiry for which the executive branch is far better-equipped than the judiciary. *See Chicago & S. Air Lines*, 333 U.S. at 111 ("[T]he very nature of executive decisions as to foreign policy is political, not judicial . . . They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry."). And regardless of the merits of the plaintiffs' concerns, it is not the Court's role to probe the motives of foreign nations, nor question the policy balance struck by the Torture Victims Protection Act. *See Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."); *see also Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 359 (D.C. Cir. 2007) (Kavanaugh, J., dissenting) ("A civil lawsuit in a U.S. court involving a foreign government, foreign officials, or foreign interests may adversely affect relations between

the United States and the foreign nation. Such cases therefore pose sensitive separation of powers issues for the Judiciary because the Constitution assigns the Executive and Legislative Branches primary authority over the foreign policy and foreign relations of the United States," thus giving rise to the "bedrock principles of judicial restraint that the Supreme Court and this Court have articulated in cases touching on the foreign policy and foreign relations of the United States.").

Without successful counterarguments, the plaintiffs have not carried their burden of showing that this Court has subject-matter jurisdiction. *See Kokkonen*, 511 U.S. at 377. The defendants can properly claim foreign-official immunity, and the Court must dismiss this action. *See* Fed. R. Civ. P. 12(b)(1), 12(h)(3).

## CONCLUSION

This case presents appalling allegations, but the Court can only hear cases over which it has jurisdiction. Lacking personal and subject-matter jurisdiction, the Court must grant the defendants' Motions to Dismiss. Dkt. 35; Dkt. 36. Also, the Court does not address the merits of the issues raised by Obiano's Motion to Strike because, regardless whether the waiver of service or the ensuing attempt at service were effective with regard to Obiano, the Court would still lack jurisdiction for the reasons explained in this opinion. *See supra* note 4. Therefore, the Court denies without prejudice Obiano's Motion to Strike. Dkt. 37. A separate order consistent with this decision accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

Date: July 19, 2018